C. W. Pool for use of Peter S. Pool & Son now for use of John D. Brown, Assignee, *v.* James White, Appellant.

| 175 | 459 |
| 27 SC | ³373 |

*Practice, S. C.—Exceptions—Allowance of exceptions nunc pro tunc.*

After an appeal to the Supreme Court has been quashed because no exceptions had been taken, the court below may subsequently, with the consent of both parties, allow the exceptions and direct the charge to be filed of record, and in such a case the Supreme Court reinstated the appeal and considered the case as if the exceptions and the charge had been taken and filed at the trial.

*Judgments—Opening judgments—Evidence.*

A bank held nine promissory notes of defendant aggregating over $50,000.  His account had also been overdrawn to the extent of over $50,000.  Subsequently the defendant gave to the bank ten judgment notes for $5,000 each, which were duly entered up.  Defendant claimed that the judgment notes had been given in full settlement of all his indebtedness including both the promissory notes and the over draft.  On a rule to open the judgments the court directed the issue to be made by the plea of payment, and the evidence to be confined to that matter.  *Held,* (1) that the burden of proof was on the defendant, not only under the pleadings, but also because the execution of the notes was admitted; (2) that certain deposit slips which defendant claimed were not credited to him were admissible in evidence with the explanation of the plaintiff that they were accidentally misdated, and were duly credited in the account at their proper dates.

*Practice, C. P.—Charge of court—Comments by judge.*

When the testimony is out of the ordinary juror's experience and the action involves loose and irregular banking transactions extending over a number of years and running into large figures, the judge is justified in commenting on the evidence with more than usual particularity and in assisting the jury, by pointing out clearly the bearing of the various items of evidence, and he may even allow his opinions to be seen without trespassing on the jury's province to decide the facts for themselves.

*Interest—Time—Computation of time—Custom—Banks.*

Where it is a custom among bankers to depart from the ordinary method of computing interest, and for the sake of convenience to compute it at thirty days to the month, and twelve months to the year, it is not error in a case involving transactions with a banker, in the absence of any evidence to show that either mode of computation was specifically agreed upon by the parties, for the judge to assume that the mode usual with bankers was to be pursued, although it was not the ordinary legal rule.

Argued Jan. 31, 1896. ` Appeals, Nos. 1 to 9, Nov. T., 1895, by defendant, from judgment of C. P. Westmoreland Co., Feb. T., 1892, Nos. 619 to 626, and 140, on verdict for plaintiffs.    Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Affirmed.

Issue to determine how much was due upon judgments.    Before KENNEDY, P. J., of the 5th judicial district, specially presiding.

The issue was framed under the following order of court:

And now, August 26, 1893, the rule heretofore granted, to wit: June 19, 1893, is hereby made absolute and judgments are opened as prayed for in said petition; the defendant to enter the plea of payment, and on the trial evidence to be confined to the matters alleged in the petitions and answers.

When the case first came before the Supreme Court the appeals were quashed because no exceptions had been taken in the court below.    On October 29, 1895, the Supreme Court made the following order:

These appeals were quashed for want of anything to show how the charge of the trial judge came into the hands of the prothonotary of the court in which they were tried.    There was no general exception, no request to have the charge written out and filed, no order upon the stenographer to prepare and file a copy, no certificate by the judge that the copy filed was correct. So far as appeared a type written copy might have been procured by any person interested in the cases and filed by him, without the knowledge of the judge.

This difficulty has been since removed.    The learned judge has certified to the correctness of the charge and ordered it filed.

We are now asked to restore these cases to their place upon the list.    On consideration of all the circumstances we have

decided to relieve the appellant so far as we are able. It is accordingly ordered that the order quashing these appeals be rescinded, that the cases be restored to the list and be thereupon continued. It is further ordered that a writ of certiorari issue to the court of common pleas of Westmoreland county, requiring the return of the records in said cases into this court, and that all processes issued by the said court of common pleas in any of the said cases be stayed until the disposition of the said appeals by this court.

At the trial it appeared that on October 19, 1891, Peter S. Pool & Son held nine promissory notes made by the defendant, James White, aggregating over $50,000. White had also overdrawn his account to the extent of over $50,000. On that day White gave to the bank ten judgment notes of $5,000 each. These notes were subsequently entered up. White claimed that the judgment notes were given in full settlement of all his indebtedness to the bank including both promissory notes and overdraft. He paid the promissory notes which he alleged was payment in full of the judgment notes, and he thereupon petitioned the court to open the judgments and let him defend on the plea of payment.

Other material facts appear from the charge of the court which was as follows:

You have been sworn here to try nine cases together; the plaintiffs and defendant being the same in all of the cases. The importance of the cases which you have been sworn to try is shown by the amount involved. The plaintiffs have held eight judgment notes each for the sum of $5,000, dated October 19, 1891, upon which judgments were regularly entered. These have been opened and the defendant let into a defense, and these eight judgment notes are in issue in the cases which you have been sworn to try, as well as a promissory note upon which suit has been brought for the sum of $6,000. So that you will observe that the aggregate of the claim of the plaintiffs in these several suits is the sum of $46,000, with interest to be added. Upon the other side, the defendant sets up a claim as set off to the claim of the plaintiffs, amounting in the aggregate to upwards of $60,000.

I mention this, gentlemen, to show you the importance of

the actions which you have been sworn to try and the importance of your duty in determining the cases.

[It seems that in 1879 the assignors of the plaintiffs, Peter S. Pool and C. W. Pool, were engaged in the banking business in the town of Irwin in your county, and Mr. White, the defendant, who was a dealer in live stock, made an arrangement with them by which he was permitted to overdraw his account with the bank to an unlimited amount; and upon which overdrafts he agreed to pay interest; statement to be made of his account every sixty days, and he to be charged interest upon the overdrawn amount, and it would follow as a result that the interest would be compounded then every sixty days upon his overdraft. The results of such an arrangement show now, gentlemen, that it was a very bad policy. There is no more wise provision in the act of congress providing for the organization and regulation of national banks than that which prohibits a national bank from lending to any one of its customers more than a small percentage of its capital stock. In this case, Mr. White, as I have told you, under an arrangement between him and the bank, was permitted to overdraw his account to an unlimited amount; and you have the legitimate results in the trials here to-day of such an arrangement. There is some testimony, I believe, to the effect that Mr. White had the same sort of an arrangement with another bank in Irwin; I don't know whether it is in evidence that that bank also failed. But I say, the bad policy of such an arrangement is shown by the results.] [1]

The arrrangement having been commenced, as I told you, in the fall of 1879, (November, I think, of that year,) Mr. White at once, or very shortly after the arrangement was entered into, overdrew his account, and according to the testimony of the witnesses the account was overdrawn nearly all, if not all, of the time from that date down to the final wind-up in October, 1891, a term of some twelve years.

[On the 19th of October, 1891, there was a meeting between Mr. White and Webster Pool, at which time the Pools claim a settlement was reached between Mr. White and the bank, and as part of the terms of the settlement he gave to Webster Pool his ten notes of $5,000 each, in settlement, as Mr. Pool claims, of the amount of the overdraft which existed at that time.

Mr. White claims, however, that the ten notes were given to cover his whole indebtedness to the bank. It appears, however, that there were other notes in existence at that time, amounting to the sum of $46,000, I believe, or perhaps upward, given by Mr. White to the Pools; some of which were due and some of which were not due at this time. Some of them had other names upon the notes as security; and this, it is claimed by the Pools, tends to show, and it does tend to show, that the notes were not given to cover notes already in existence; because they had not only notes for this amount of $46,000, but some of them with other names upon them than Mr. White's, and the Pools would not do such a foolish thing as to surrender notes with security upon them for the individual notes of Mr. White.] [2] It is claimed too, and the testimony shows, that some of the notes in existence, part of these $46,000 notes, were not yet due, and that it would be a strange proceeding for Mr. White to give other notes in addition to these that the Pools already held, which were not yet due. These circumstances have been brought out in the testimony as tending to show that the theory of Mr. White, that he gave these notes in payment of all of his indebtedness, is not the correct theory. The Pools claim, and Mr. White says in so many words, that Mr. Pool showed him at the time of this settlement that his overdraft was $50,000, or upwards, and the Pools claim that it was for this amount the notes were given.

Mr. White says that on going back over the account for twelve years he wouldn't owe more than $40,000 or $50,000, and that therefore he is not entitled to pay the notes in suit in these cases, because he has already paid certain judgments, and is liable for other claims or judgments which he must pay and which would cover the whole of his indebtedness to the Pool bank; and that upon a proper settlement of the accounts between them he would not be indebted to the bank in any sum whatever; that on the other hand, the bank would be indebted to him.

I have said that he was under this arrangement to be charged with interest compounded every sixty days upon this overdraft. A statement of the interest charged has been testified to by one of the experts in the course of the trial, and according to his calculation the bank has charged Mr. White excessive interest,

over six per cent. The Pools say that Mr. White was to pay
interest compounded every sixty days, and at the rate of eight
per cent. I have to say to you, gentlemen of the jury, that the
bank would not be allowed to charge a greater rate of interest
than six per cent; and the expert, in computing the amount of
overcharge of interest claimed to have been made by the Pools
against Mr. White, calculated the interest, as he says, at six
per cent, and he finds the amount of overcharge of interest on
the overdrafts and overdue notes to be upwards of $4,000 or
$5,000. That was covered in two periods. The amount which
he gave you as overcharge during the period between Novem-
ber 18, 1879, about the time of the commencement, and June 1,
1883, was $953.22, and compounding the interest on that every
sixty days, which Mr. White will be allowed to do, if there has
been an excessive charge of interest against him, in order to
make him even, he should be allowed a credit of interest also
compounded every sixty days on the overcharge. As I was
going on to say, the first period covered by the expert was from
November 18, 1879, to June 1, 1883; the amount of the over-
draft was $953.22; the interest compounded, $545.32; the
account of both, $1,498.54. And between June 1, 1883, and
November 21, 1891, to which period these calculations are all
made, the amount of excessive charges of interest on the over-
draft and overdue notes was $4,552.60 ; and compounding the
interest on that every sixty days makes $1,302.95, which, added
to the other, would be $5,855.55. And the expert also figures
an overcharge of interest or discount in the discounting of
the notes—which overcharge I presume he means anything
over six per cent—of $623.63. Compounding the interest on
that every sixty days makes $405.34, and the aggregate of
this overcharge, according to the statement of the expert, is
$1,037.77(?). Those are items which added together make an
overcharge, resulting from this excessive charge of interest by
the bank against White, of upwards of $8,000, according to the
statement and calculation of this expert.

[I must say to you, gentlemen, though, that in making that
calculation he followed a basis that is not recognized, as I
understand, in Pennsylvania. The basis of calculation which
you are to recognize in estimating the amount of overcharge
here—if you find there is to be any in the way of interest—is

upon the basis of thirty days to the month and twelve months in a year. That I understand to be the basis of calculation recognized in Pennsylvania, and that you must follow in reaching the amount, if there is any overcharge of interest, and not that followed by the expert, Mr. Woolsey.] [3] The overcharge would not reach so much, calculating it upon the basis which I have given you, as on the basis followed by Mr. Woolsey. We have not estimated the difference, but it is for you, gentlemen, to ascertain that. And if you should find, I say, that there is an overcharge here of interest, over and above six per cent, then it will be your duty to allow that credit to Mr. White in the adjustment of his account in returning the amount of your verdicts in these different cases.

But by far the larger item of offset claimed by the defendant, Mr. White, in these cases is the item of upwards of $30,000, made up of claims of omission to credit to which he says he is entitled and which the Pools failed to give him in his account with the bank, and the overcharges upon certain checks or items of security brought to the bank for payment or deposit. Those items, as calculated by the expert, reach the surprising sum, as I have said, of upwards of $30,000, and calculating the interest on this upon the same basis, and compounding it every sixty days, there would be added to that upwards of $19,000. The amount of the principal of these items and interest thereon would reach the sum of upwards of $50,000; which added to the item of overcharge of interest to which I have referred, makes the total claim of set-off by the defendant upwards of $60,000.

In referring to the items of set-off, as claimed by the defendant against the claim of the plaintiffs, there are certain principles to be followed by you in consideration and determination of these cases. The claims of the plaintiffs in the various suits are evidenced by the notes of the defendant in writing, the execution of which is not denied by the defendant, and hence the burden of proof is upon the defendant to satisfy you by the preponderance of evidence—by the weight of the testimony— that he has a valid defense thereto, and the evidence must be clear and positive and convincing. It is not sufficient, to entitle the defendant to the allowance of the items of his defense, that there be oath against oath ; there must be more than that.

There must be a preponderance of the evidence as to the items claimed, or any of them, before the same can be allowed by you; and the evidence must be, as I have said, positive, clear and convincing. But if, in the consideration of the cases, you are satisfied from the weight of the testimony, which, as I have said, must be clear, positive and convincing, that he is entitled to any of the items of his claim you will allow them. In doing so you will take into consideration all the facts and circumstances in the evidence, including the credibility of the witnesses, of which you are the judges. In this connection, gentlemen, you will understand how difficult it is, how almost impossible, I may say, for bankers—those in the position of the Pools in this case, to testify to the transactions of the nature of those involved in these cases. They must necessarily rely upon their books and papers in making their statements upon the witness stand. In this trial we have had striking illustrations of the unreliability of human recollection, and the mere fact that items have been found by the defendant, White, which seem to be unexplained, does not entitle him to their credit merely because the Pools cannot explain them from their recollection. Let me say, however, the plaintiffs do claim that they have explained all, or nearly all these items; but, as I say, the mere fact of the defendant, White, finding items which the Pools could not explain from recollection would not entitle him to the credit of those items. But if, from all the facts and circumstances and evidence in regard to those items, you are satisfied that he is entitled to the credit of them, or any of them, you will allow them.

[Take, for instance, the deposit slips, of which there have been several offered in evidence, and credit claimed by Mr. White, because they do not appear on the books of the bank. If any of you have had business with the banks, and I doubt not that most of you have had, you have seen deposit slips made out and afterwards changed, or not used. It is true, if they were not used they should have been destroyed; especially if they were made out by members of the bank it would be expected that they would be destroyed. But if, on the other hand, the parties in the bank making out the slips pocketed the cash or securities represented on them, it is natural to assume that the first thing they would do would be to destroy the de-

posit slips; otherwise they would turn up hereafter to detect them. Hence I say, that the mere fact of the finding of these deposit slips which the Pools are unable to satisfactorily explain from recollection, or otherwise, is not sufficient in itself to charge them with the items of those deposits. But if, from the weight of the testimony, as I have said before, you are satisfied by clear, convincing and positive testimony that White is entitled to the credit of those items you will allow them. You will bear in mind, though, that the plaintiffs claim to have explained the items satisfactorily.] [4]

So to the matter of finding checks brought to the bank for deposit by White, of which the whole amount is not placed to his credit on the books. That is not sufficient in itself to entitle him to the difference, as he may have got that difference in cash or in some other value. But in these cases also, if you are satisfied from the weight of the testimony that he did not get value for those differences, they are to be allowed in the determination of these cases. But you must be so satisfied from the weight of the testimony, that he is entitled to them, before you can allow them as matter of credit. I deem it my duty to call your attention to these matters by way of caution, that you may not err in the consideration of these cases.

Coming to the items making up that large item of credit which the defendant claims, I will refer to two or three of them very briefly. I do not deem it my duty, nor that it is necessary at all to go over these items in detail. They have been commented upon by counsel on both sides, and I think you have received from them all the assistance you may need in determining the questions which will arise in these cases, but I will refer to two or three briefly.

The first item of credit claimed by the defendant is that of $20.00 upon what is known as the Joseph Myers check. That check seems originally to have been drawn for the sum of $62.00 and afterwards changed, adding thereto $20.00, making the check $82.00. Mr. White claims that he only got $62.00 upon that check and that he should not be charged with $82.00; in other words, that he is now entitled to a credit of $20.00, with interest on that item compounded every sixty days down to 1891. The Pools explain that, and Peter Pool on the stand said he made the change. The whole transaction on its face

shows that it was changed from 62 to 82. Mr. Pool says the bank actually paid $82.00 upon that check, and he explains it in this way, from his recollection: That it was drawn, as I have stated, originally for $62.00 and Mr. White had left the bank, and coming back afterwards Mr. White told him that he had bought another hog, or a bull, or something from Mr. Myers, and to add $20.00 to that check; Mr. Pool says he did so and paid $82.00 to Mr. Myers. If that is correct then the plaintiffs ought not to be charged with that extra $20.

The next item is the check which Mr. White claims was for $1,500. The Pools say they paid $1,520 instead of $1,500; that the $20.00 was actually paid out. If that is correct, of course the plaintiffs are not to be charged with that as an item of set-off.

The next is the Ullman draft for $1,768.28. That has been so thoroughly discussed and during the course of the trial you have heard my views upon it, that I only refer to it now briefly. There was originally a check left by Mr. White at the bank for $3,766.21, for which he received credit in the bank, and that check was subsequently protested. There is, as I recollect from the testimony, no evidence that it was ever paid, except the sum $2,000, which was some time afterwards paid on account. Mr. White subsequently taking the balance $1,766.22, and the cost of the protest, $2.06, making $1,768.28, drew a draft on Ullman for the purpose of paying the balance of this check; and that draft came back unpaid, according to the testimony. Now, of course, gentlemen of the jury, if that is correct, it would be improper to charge the bank with the draft. Mr. White had already got credit for the amount of the draft in getting credit for the original check of $3,766.22, and it would be wrong to give him credit for the amount of the draft. I needn't refer to that further; I think you understand it.

The next is the Schamberg check, $300.57. Mr. White claims he only got $255.07. They produce the original deposit slip, showing that he only got credit for a part of the Schamberg check, $255.07. Mr. White claims he should have credit for the whole, the difference being $45.50. The Pools say that he got that in cash, and that the deposit slip itself shows that. He is only credited on the books with a part of that Schamberg check. And so they explain a great many of these similar items

which are now claimed by the defendant as credits on this account. They say that Mr. White got those items in cash; that at the times he would bring in checks he would get portions of those checks in cash, and sometimes he would get the whole of little checks in cash. Mr. White denies that, and says he never got cash from the bank except upon his own check. The Pools say that he not only got cash on his own checks, a large number of which have been offered in evidence; but that he got cash on other checks, foreign checks, as they are called, which were brought by him to the bank. If you are not satisfied that he did not get the cash in the way claimed by the Pools, it will be your duty to disallow those items in making up your verdicts in these cases. Or otherwise to follow the rule that I have already laid down to you, that it would be Mr. White's duty to satisfy you from the weight of the testimony that he is entitled to those items of credit.

I do not think I need refer to many more of these items. There is an item of credit claimed for a draft which was drawn for $1,840.16. Mr. White claims credit because they found a stub on a draft book which was marked "no good," "not sent," "canceled," or words to that effect. The Pools explain that by saying that that draft, the stub of which appears on the book, was drawn originally upon the Farmers' Deposit Bank of Pittsburg, and that upon referring to their account with that bank they didn't have sufficient funds there to meet it, and they canceled that draft and drew another one on the Penn Bank. The evidence of the drawing of that you have had before you. The person who has charge of the Penn Bank books was here and testified, and you have the Penn Bank book itself, showing there was a draft drawn by the Pools for this amount upon that day. If that is the case, then Mr. White is not now entitled to another credit for this draft; he having already received one in his account.

We have the transaction which was referred to at the last by the counsel in addressing you, the check for $5,430.29, to which Mr. White claims a credit, saying that it was originally drawn for two drafts which were to be used by him in the payment of bills for cattle to Heskett & Renigher and Briggs & Drum. They were drawn on the evening of the 14th, and, he says, subsequently on taking them home he discovered they were for

incorrect amounts, and he took them back the next morning, the 15th, and obtained other drafts for different amounts, and amounts larger than the amount of those two, and that he gave another check for the aggregate amount of the two new drafts, and that the check given on the 14th should have been canceled and he not charged with it at all. The plaintiffs answer that by saying and claiming to you that the books show, or tend to show, that he got those first two drafts not on the evening of the 14th, but on the morning of the 14th; and that after obtaining them did not take them from the bank; that they were canceled, or the names torn off subsequently, and that instead of the drafts they gave Mr. White at the time the amount in currency, or cash, $5,430.39. [Of course, if he got the cash, he is not entitled to a credit for that amount now. The defendant claims that Mr. White never carried any considerable amount of cash; he didn't pay his bills in cash, and that he never received such an amount as that in currency, or cash. The Pools answer that by stating—all of them, I believe—that he frequently got currency from the bank to pay his bills; that he not only got it himself and carried it away, but that he sent it by messenger to the stock yards to pay his bills. In support of that they produce the messenger, who says the same thing; he says he did carry cash for Mr. White, and the Pools too, and delivered it to the agent at the stock yards for payment of bills to the dealers there; and he says that not only the Pools gave him packages for that purpose, stating they were cash, and to be used for that purpose, but that Mr. White himself gave him packages, which he said contained money to be used in the same way.] [5]

Plaintiffs' points among others, were as follows:

2. The cases which you are sworn to try, with one exception, are upon judgments which were entered against the defendant, and afterwards opened by the court. As the execution of these judgment notes has not been disputed the burden is upon the defendant to prove that in equity he is not liable to pay them, or some of them, and as the testimony of plaintiffs and defendant is contradictory, the defendant must furnish other evidence in his favor, which, together with his own, shall be of a clear, satisfactory and convincing character in order to be relieved from liability. In other words, the notes upon which suit has

been brought must stand, unless the defendant has shown by
evidence that in equity and good conscience he ought not to
pay the indebtedness which they appear to represent. *Answer:*
This point is refused, with the explanation which I will make
after reading the third and fourth points, and which explana-
tion will apply to all three of these points.

3. As the equitable principle just adverted to runs through-
out this entire case, we instruct you wherever you find an un-
disputed signature of James White to a note, check or draft,
and the attempt is made by him to escape the liability it imposes,
if that attempt is unsupported by any other testimony, and his
version of the transaction is contradicted by the plaintiffs, you
will entirely disregard his testimony and disallow his claim.
Under such circumstances the version of the plaintiffs, corrobo-
rated, as it is, by the written instrument, must prevail. *An-
swer:* This point is refused, with the explanation, as I told you,
I will presently make.

4. The same principle applies to any other item of credit
claimed by the defendant White which rests on his unsupported
testimony, which is denied by the plaintiffs. Having given
these notes he cannot be permitted to escape from the payment
of any portion of them on his own oath, except it might be by
showing direct payment and satisfaction afterwards, which is
not pretended in this case. *Answer:* This point is refused. I
am constrained, gentlemen, to refuse those three points. They
seem to eliminate from your consideration both the corroborat-
ing circumstances and the matter of the credibility of the wit-
nesses, but in refusing them I desire to make this explanation,
as I have already said to you, that the burden of proof is on the
defendant. He must satisfy you by the preponderance of evi-
dence, by the weight of the testimony, that he is entitled to the
items of credit claimed by him. If the evidence for and against
an item is evenly balanced—no preponderance upon the part of
the defendant—his evidence as to that fails, and the item must
be disallowed. So if an item of the defendant depends solely
upon the testimony of defendant, uncorroborated and unsup-
ported, and is denied or contradicted by the plaintiffs, all other
things being equal, there being no difference in the credibility
of the witnesses, that item of defense must fall. You are, how-
ever, the judges of the credibility of witnesses. You will, in de-

termining this, take into consideration all of the testimony, and if the defendant has satisfied you by the weight of the testimony that he is entitled to credit for any items, you will allow them in your reduction of the plaintiffs' claim ; but if not so satisfied you will not allow the items of defense.   The claims of the plaintiffs in these cases are evidenced by notes of the defendant in writing, and the burden of proof is upon the defendant to show by clear and positive testimony that the collection of these notes is not to be enforced.   When parties give obligations in writing the burden of proof is upon them to satisfy you that those written obligations are not to be enforced.   You must satisfy yourselves according to these principles, and if the defendant has failed to produce such evidence, the plaintiffs' claim must stand. [6]

. Verdicts and judgments for plaintiffs in the several issues aggregating $21,670.20.   Defendant appealed.

*Errors assigned* were (1–6) above instructions, quoting them.

*Edward E. Robbins* and *Paul H. Gaither, H. P. Laird, John B. Keenan, J. A. Marchand* and *J. E. Kunkle* with them, for appellant.—The entry in the bank by the proper officer of the amount and date of the deposit is prima facie evidence that the bank received the amount, and binds the bank like any other form of receipt.   But the entry is only a receipt and is open to explanation by evidence aliunde, and if shown to be a mistake is no longer binding upon the bank : 2 Am. & Eng. Ency. of Law, 102 ; Union Bank v. Knapp, 3 Pick. 96 ; Weissinger v. Bank, 10 Lea (Tennessee), 330 ; Ward v. Leitch, Exr., 30 Md. 326 ; The burden of proof, assuming the existence of the confidential relationship, must have been on the plaintiff to show that the transaction between them was "righteous and conscientious : " Smith v. Loafman, 145 Pa. 636 ; Yardley v. Cuthbertson, 108 Pa. 460 ; Hare & Wallace Leading Cases in Equity, 430 , Darlington's Est., 147 Pa.; 630 ; Worrall's App., 110 Pa. 349 ; Douglass's Est., 162 Pa. 568 ; Boyd v. Boyd, 66 Pa. 283 ; Wilson v. Mitchell, 101 Pa. 495 ; Miller v. Oestrich, 157 Pa. 268 ; Frew v. Clarke, 80 Pa. 180.

It is error to confine the attention of the jury to one view of the case, where there is more than one which they should con-

sider: Penna. Land Co. v. Harris, 101 Pa. 80 ; Garret v. Gonter, 42 Pa. 143 ; Washington Mut. Fire Ins. Co. v. Rosenberger, 3 W. N. C. 16 ; Penn Iron Co. v. Diller, 17 W. N. C. 6.

*John F. Wentling* and *John B. Head, James S. Moorhead* and *David A. Miller* with them, for appellees.—A trial judge may express his opinion freely on the weight and value of evidence, and when he does so without misleading or controlling the jury in the disposition of the facts, there is no ground of reversal: Fredericks v. R. R., 157 Pa. 104; Spear v. R. R., 119 Pa. 61; Kilpatrick v. Com., 31 Pa. 216 ; Bitner v. Bitner, 65 Pa. 363 ; Johnston v. Com., 85 Pa. 60.

OPINION BY MR. JUSTICE MITCHELL, May 18, 1896 :

When this case was first here the appeal was quashed because it nowhere appeared that any exception had been taken in the court below, or that the charge had been approved by the judge or filed by his order: 171 Pa. 500. Subsequently the learned judge who tried the case, with the consent of counsel of both parties, approved the charge and directed it to be filed of record. This though not so expressed in terms, must be considered as a filing nunc pro tunc, and the case is therefore regularly before us, as if the exceptions and the charge had been taken and filed at the trial.

Notwithstanding the bulk of the record there is very little in the case but a question of fact. The issue was upon a judgment opened to determine whether the previous notes in the hands of the plaintiffs in October, 1891, at the time the defendant gave the ten judgment notes in suit, were included in that settlement. These prior notes being admitted to be due, the court required them to be paid, and then permitted such payment to be set off in the actions on the later judgment notes. These notes were entered up separately, but the opened judgments were tried together and we shall treat them as a single case.

The burden of proof was on the defendant, not only because the execution of the notes was admitted, but also because in the order opening the judgments the court had directed the issue to be made by the plea of payment, and the evidence to be confined to that matter as alleged in the petition and answer. This

consideration does away with the force of the principal assignments of error. The fourth which is the most important in the amount involved by it, relates to the deposit slips. These under the circumstances of the case were evidence of deposits which should be credited to the defendant in making up the account, but they were not conclusive, and had to go to the jury with the explanation of the plaintiff that they were accidentally misdated, and were duly credited in the account at their proper dates. The court submitted them in this way, and there was no error in so doing.

The sixth assignment relates to the refusal of the plaintiff's points followed by a substantial affirmance. They were refused because of the form of expression, which as the learned judge said seemed " to eliminate from consideration both the corroborating circumstances, and the matter of the credibility of the witnesses," but in substance they were correct statements of the burden of proof, and there was no error in so affirming them.

The remaining specifications of error are to the expressions of opinion by the judge on parts of the evidence. The case was one which justified the judge in commenting on the evidence with more than usual particularity. It was out of the ordinary juror's experience, involving very loose and irregular banking transactions extending over a number of years and running into large figures in which a jury might easily get bewildered. The judge assisted them by pointing out clearly the bearing of the various items of evidence, and if he sometimes allowed his own opinion to be seen, we do not find that he trespassed at any point on the jury's province to decide the facts for themselves.

In regard to the calculation of interest the strict legal rule is certainly to compute it according to the actual time, three hundred and sixty-five days to the year. But it is the custom in banks and some other kinds of business where calculations of interest are required frequently, to compute it for the sake of convenience at thirty days to the month and twelve months to the year. The result when calculated for a year is of course the same, the exact six per cent on the sum involved, and the difference in amount for fractions of a year is usually so small as to be unimportant. The present transactions were with a

banker, and in the absence of any evidence to show that either mode of computation was specifically agreed upon by the parties, it was not error for the judge to assume that the mode usual with bankers was to be pursued, though it is not the ordinary legal rule.

Judgment affirmed.